WARNER CABLE COMMUNICATIONS, INC., f.k.a. Warner
Amex Cable Communications, Appellant,

v.

LIMBACH, Tax Commr., Appellee.

[Cite as *Warner Cable Communications, Inc.
v. Limbach* (1990), 67 Ohio App.3d 458.]

Court of Appeals of Ohio,
Franklin County.

No. 89AP–889.

Decided *Nunc Pro Tunc* on April 26, 1990.

**460**

*Schottenstein, Zox & Dunn, Leonard A. Carlson* and *Stephen R. Tumbush,* for appellant.

*Anthony J. Celebrezze, Jr.,* Attorney General, and *James C. Sauer,* for appellee.

*Vorys, Sater, Seymour & Pease, Raymond D. Anderson* and *Matthew J. Barrett,* for *amicus curiae* Ohio Cable Television Association.

RALPH WINKLER, Judge.

Appellant, Warner Cable Communications, Inc., f.k.a. Warner Amex Cable Communications (hereinafter "Warner"), has filed this appeal from a decision and order of the Ohio Board of Tax Appeals (hereinafter "BTA"), dated June 30, 1989, affirming a final order of the Tax Commissioner (hereinafter "appellee"), dated March 25, 1987, imposing a sales and use tax assessment. Warner asserts the following assignments of error:

"I. The Board of Tax Appeals erred in affirming the Tax Commissioner's assessment of sales and use tax[es] with respect to the transactions at issue which were shown to be used directly in the rendition by appellant of its public utility service.

"II. The Board of Tax Appeals erred in not finding that the appellant's rights of due process under the Constitution of Ohio and the Constitution of the United States were violated.

"III. The Board of Tax Appeals erred in refusing to remit the penalties imposed against appellant."

Warner is a cable television company providing programs to subscribers' homes over cable trunk lines. The appellant utilizes the following programming sources: off-air signals picked up from local broadcasters, programs via microwave transmissions from other locations, program signals from satellites, programs purchased in the form of videotape, programming via telephone circuits, and production of its own programs. Subscribers viewing the programming cannot differentiate the source of the programming.

The items involved in the sales and use tax assessment are numerous, but were broken down by BTA into five general categories as follows:

(1) *Videotapes* and videotape cartridge reloading purchases were used to tape programming and to play back the programming through the cable system to the subscribers' homes. The amount of tax assessed on account of these purchases totaled $9,666.52.

(2) *Transmission equipment* is used at various stages of signal processing. The purchases can be grouped into five basic categories: power supply, signal modulating equipment, character and graphic generators, repair and maintenance items, and miscellaneous parts. The tax assessed for these purchases totaled $41,766.66.

(3) *Production equipment* included a wide range of items from lighting, cameras, color tubes, lenses and audio equipment to remote production units and processing equipment. These transactions were related to the production of programming by Warner itself. The total tax assessed on these purchases amounted to $135,429.38.

(4) *Computer equipment* was used to manage the cable systems in their day-to-day functions and operations. The computers stored the data base which indicated whether a person could receive a particular cable service, an installation scheduling system, a billing and accounts receivable system, a credit and collection system and a market research service. There were additional purchases to update and service the system. The tax assessed for the computer equipment was $246,091.22.

(5) *Repair and maintenance trucks and equipment* including purchases of mobile phones used for communications between technicians working on the cable system, and/or between a technician and the dispatcher; truck ladder racks installed on the service trucks to carry ladders necessary for technicians working on the cable system; several varieties of repair trucks; and repairs made upon trucks used in servicing the cable system. The amount of tax assessed for these purchases was $1,760.40.

Warner was audited by the appellee concerning sales and purchases for the period of January 1, 1980 through December 31, 1982, resulting in a sales and use tax assessment in the amount of $245,159.04 in sales tax and $665,580.74 in use tax, plus a conditional penalty. Warner filed a petition for reassessment and remitted a partial payment of $471,648.86, which Warner asserts corresponds to the unpaid sales and use taxes for purchases made in connection with its security service division (admittedly not a part of the public utility service). The petition was denied. The appellant then filed a notice of appeal to the BTA. Warner objected to the assessment with regard to the five general categories previously mentioned, contending that, because it provided

a public utility service and the goods and services purchased were used directly in rendering its public utility service, the purchases were exempt from taxation. A hearing was held by the BTA, which rendered its decision and order rejecting appellant's contentions. Warner brings the instant appeal seeking a review of the BTA's decision.

In its first assignment of error, Warner contends that the BTA erred in its finding that the activities and transactions which are the subject of the appeal did not qualify as a public utility service and/or were not used directly in the rendition of its public utility service and, therefore, were taxable incidents.

R.C. 5739.02 levies an excise tax on each retail sale made in the state of Ohio. Likewise, R.C. 5741.02(A) levies an excise tax on the storage, use, or other consumption in this state of tangible personal property or the benefit realized in this state of any service provided. Warner claims an exemption from the sales and use taxes pursuant to R.C. 5739.01(E)(2) and R.C. 5741.-02(C)(2), respectively. As aptly summarized by the BTA, R.C. 5741.02(C)(2) excepts from the use tax those transactions which would be excepted from the sales tax. In light of this, only the sales tax exception will be discussed. R.C. 5739.01(E) provides in pertinent part:

" 'Retail sale' and 'sales at retail' include all sales except those in which the purpose of the consumer is:

" * * *

"(2) * * * [T]o use or consume the thing transferred * * * directly in the rendition of a public utility service * * *[.]"

R.C. 5739.01(P) defined " '[u]sed directly in the rendition of a public utility service' * * * " as:

" * * * [T]hat property which is to be incorporated into and will become a part of the consumer's production, transmission, transportation, or distribution system and which retains its classification as tangible personal property after such incorporation; fuel or power used in the production, transmission, transportation, or distribution; and tangible personal property used in the repair and maintenance of the production, transmission, transportation or distribution system, including only such motor vehicles as are specially designed and equipped for such use."

In determining whether this exception applies to appellant, there is a three-step process of review: (1) whether the taxpayer is a regulated public utility service; (2) whether it was rendering a public utility service when the purchases were made; and (3) whether the item purchased was used directly in rendering the public utility service. *Manfredi Motor Transit Co. v. Limbach* (1988), 35 Ohio St.3d 73, 76, 518 N.E.2d 936, 939. If the item is used

in a dual purpose (*i.e.*, used in a manner which would provide exception from the tax and in a manner that would not), the "primary use" test is applied. *Id.* See *A.J. Weigand, Inc. v. Bowers* (1960), 171 Ohio St. 78, 12 O.O.2d 90, 167 N.E.2d 772, for a discussion of the "primary use" test.

A consumer does not have to be defined by statute as a public utility or regulated by the state as a public utility in order to have its purchases excepted from sale and use taxes under R.C. 5739.01(E)(2) and R.C. 5741.-02(C)(2). *Trans World Airlines v. Porterfield* (1970), 22 Ohio St.2d 177, 179, 51 O.O.2d 238, 239, 258 N.E.2d 458, 459. Statutory definitions given to "public utility" in other chapters of the Revised Code (R.C. 4905.02 and 5727.01) are likewise not dispositive in our instant application of R.C. Chapter 5701 *et seq.*, because those definitions are relevant solely to the statutory chapters in which they are located. *Vernon v. Warner Amex Cable Communications, Inc.* (1986), 25 Ohio St.3d 117, 119, 25 OBR 164, 165, 495 N.E.2d 374, 375. To constitute a "public utility," the devotion to public use must be of such character that the product and service are available to the public generally and indiscriminately or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state. *Southern Ohio Power Co. v. Pub. Util. Comm.* (1924), 110 Ohio St. 246, 143 N.E. 700. Certainly, Warner's cable system and programming were held out to the public in a general and indiscriminate fashion and the purchases were made while it was providing the cable service to the public. In fact, during the audit period, Warner had over one hundred forty-seven systems serving 1.2 million subscribers in several states. More importantly, the BTA and the appellee excepted from assessment certain purchases "to the extent that the appellant operated as a public utility." Appellee is estopped from denying Warner operated its cable system as a public utility at the time the purchases were made.

When determining whether the acquisition or use of property is excepted from the sales and/or use taxes as property "[u]sed directly in the rendition of a public utility service," the determination depends upon whether the property satisfies one of the three standards set forth in R.C. 5739.01(P), which is set forth above. *Cincinnati Gas & Elec. Co. v. Kosydar* (1974), 38 Ohio St.2d 71, 76, 67 O.O.2d 81, 84, 310 N.E.2d 245, 248. We shall proceed by applying the statute to each of the five categories of purchases created by the BTA.

The items purchased in the first four categories must have been incorporated into and had to become a part of the consumer's production, transmission, transportation, or distribution system and retain their classification as personal property after such incorporation. R.C. 5739.01(P). The term "production system" has been judicially interpreted as comprising those items, and only

those items, which are essential to the continuous production of the public utility service. *Cincinnati Gas & Elec. Co., supra.* Property may be essential to the continuous production of the utility service even though the utility might theoretically have provided its service without having acquired the property at issue. *Cleveland Elec. Illum. Co. v. Lindley* (1982), 69 Ohio St.2d 71, 74, 23 O.O.3d 118, 120, 430 N.E.2d 939, 941. Under R.C. 5739.01(P), it is enough that the property, once acquired, is actually incorporated into and used as part of a vital or essential step in the production process. *Id.*

■ (1) *Videotapes:* These items were used to store and replay recorded programming over Warner's cable system. The property was incorporated into and used as part of an essential step in the process, to wit, providing and transmitting programs over its trunk lines to the subscribers' homes. Videotape was a viable and substantial means of providing its programming to its subscribers. Appellee and the BTA erred in including these purchases in the assessment.

■ (2) *Transmission Equipment:* The BTA decision concluded that these items were used at various stages of signal processing. We are unable to see how signal processing could be considered anything but a vital and essential step in the production and transmission of the cable service. Again, appellee and the BTA erred by including the transmission equipment in the assessment.

■ (3) *Production Equipment:* The items purchased were used by Warner to originate its own programming which was eventually transmitted to its subscribers' homes. The public utility service of Warner was providing and transmitting programming over its trunk lines to the homes of its subscribers. An essential step in rendering this service is the acquisition and/or creation of programming to transmit to the viewers. The programming's origin is irrelevant to the subscriber and, in this case, in determining the tax status of purchases connected to their acquisition. Purchased items used in production of programming and purchased items incident thereto are used directly in the rendition of Warner's public utility service. Appellee and the BTA erred by including these items in the assessment.

■ (4) *Computer Equipment:* According to the BTA, the computer system controlled the daily operation of the cable system. The system provided data concerning installation as well as access to various packages of programming. Additionally, it maintained a billing system and the information concerning termination of the cable service. The equipment was essential to providing access to, enjoyment of and termination of the programming transmission. The system controlled what programming the subscriber was provid-

ed. The computers were used directly in the rendition of a public utility service and should have been excepted from the assessment.

■ (5) *Repair and Maintenance Trucks and Equipment:* These items must have been tangible personal property used in the repair and maintenance of the production, transmission, transportation or distribution system, including only such motor vehicles as were specially designed and equipped for such use. R.C. 5739.01(P). The trucks which were specially equipped varied as follows: the standard van was equipped with ladder racks on the outside and bins inside to hold the various parts used to repair the cable system; bucket trucks had a hydraulic bucket to allow for line repairs and a standby power supply in the form of a generator; and cherry pickers were likewise used for line repairs. The vehicles were specially designed, equipped and used to maintain and repair the cable system. The mobile phones and other miscellaneous equipment purchases were used by the technicians to provide efficient and effective repair service to the cable lines and system as a whole. Appellee and the BTA erred by including these purchases in the assessment.

Accordingly, appellant's first assignment of error is sustained.

■ We turn next to Warner's third assignment of error. Warner argues that the BTA erred in refusing to remit the penalties imposed against appellant. At the time of the assessment, R.C. 5739.13 read, in pertinent part, as follows:

"A penalty of fifteen per cent shall be added to the amount of every assessment made under this section. The commissioner may adopt and promulgate rules providing for the remission of penalties added to assessments made under this section." Am.Sub.H.B. No. 530, 139 Ohio Laws, Part I, 985, 1096.

R.C. 5741.14 provides that R.C. 5739.13 applies to use tax assessments as well. The imposition of a penalty is mandatory in the event of an assessment. *Jennings & Churella Constr. Co. v. Lindley* (1984), 10 Ohio St.3d 67, 70, 10 OBR 357, 359, 461 N.E.2d 897, 900. The remission of a penalty under this provision is discretionary with appellee and cannot be reversed by the BTA unless an abuse of discretion is demonstrated. *Frankelite Co. v. Lindley* (1986), 28 Ohio St.3d 29, 31, 28 OBR 90, 92, 502 N.E.2d 213, 215, citing *Interstate Freight Sys. v. Bowers* (1960), 170 Ohio St. 483, 485, 11 O.O.2d 240, 241, 166 N.E.2d 229, 231. An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable. *Jennings & Churella Constr. Co., supra.* Warner has previously paid that amount of the assessment which the court, in this decision, determines to be the proper tax amount. The balance of the original assessment ordered by appellee has been reversed.

The penalty imposed on the tax actually paid by Warner ($471,648.86) is proper pursuant to R.C. 5739.13 and R.C. 5741.14. However, in light of this decision, any other fifteen percent penalty imposed on the balance of the assessment by appellee would be unreasonable in amount and substance, and would be an abuse of discretion.

Accordingly, appellant's third assignment of error is sustained.

Appellant's second assignment of error alleges the BTA erred in not finding that appellant's rights of due process under both the Ohio Constitution and the United States Constitution had been violated. Warner argues that nowhere in its notice of appeal was the issue raised as to whether or not it was a public utility service. Therefore, appellee's post-hearing brief, which argues for the first time the issue of whether Warner was rendering a public utility service, was not properly before the BTA and should not have been considered.

The issue on this appeal was whether Warner should be excepted from a sales and use tax assessment because the purchases were used directly in the rendition of a "public utility service" as defined in R.C. 5739.01(P) and, therefore, excepted from the definition of "retail sales" pursuant to R.C. 5739.01(E)(2) and R.C. 5741.02(C)(2). Inherent in the question of whether a purchased item was used directly in the rendition of a public utility service are the existence and scope of the utility service. Appellant acknowledged in footnote 3 of its brief that certain of its purchases in the assessment were used for services other than its public utility service. The issue was impliedly raised in appellant's notice of appeal; therefore, appellant's second assignment of error is not well taken.

Based upon the foregoing, appellant's second assignment of error is overruled. Appellant's first and third assignments of error are well taken and are sustained on that basis. The decision and order of the Board of Tax Appeals is hereby reversed and remanded to the Board of Tax Appeals for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

REILLY, P.J., and STRAUSBAUGH, J., concur.

RALPH WINKLER, J., of the Hamilton County Common Pleas Court, sitting by assignment.